Raytheon Company  617 862 6600
Executive Offices
141 Spring Street
Lexington MA 02173

# Raytheon

October 1, 1998

Mr. Dennis M. Donovan
24 Gravesleigh Terrace
Pittsfield, MA 01201

Dear Dennis:

    We hereby extend to you the following severance arrangements and other terms relating to your employment with the Raytheon Company. For convenience, we refer to you as "Donovan" or "the Executive" and to Raytheon as "Raytheon" or "the Company." If you accept the terms offered herein, this Severance Agreement shall be dated as of October 1, 1998 (the "Effective Date").

    If these terms are acceptable, please sign and date a copy of this letter and return it to me at your first convenience.

1. **Initial Term of Employment.**

    Executive's employment hereunder shall commence on October ___, 1998 (the "Commencement Date" and October ___ to be the "Anniversary Date") and shall continue through January 15, 2002 (the "Initial Employment Term"), unless renewed pursuant to Section 3 below, or terminated in accordance with the terms hereof.

2. **Renewal of Term of Employment.**

    No more than two-hundred seventy (270) days after the Commencement Date, the Company shall provide written notice to the Executive specifying whether it wishes to renew the Initial Employment Term for an additional three (3) year term beginning on the Anniversary Date one (1) year after the Commencement Date (an "Additional Employment Term") on the terms and conditions hereunder. In the event the Company provides notice of its desire to renew, Executive shall have thirty (30) days after such notice to accept or reject such renewal. If the Executive accepts such renewal, a three (3) year Additional Employment Term shall commence on the next following Anniversary Date.

    In the event that (i) the Company elects not to renew the Initial Employment Term (or any subsequent Additional Employment Term) or (ii) the Company elects to renew the Initial Employment Term (or any subsequent Additional Employment Term) and the Executive rejects such renewal, in either case the Initial Employment Term (or any subsequent Additional Employment Term) shall terminate according to its terms.

In the event the Company does not make the written notification specified in this Section 2, the Initial Employment Term (or any subsequent Additional Employment Term) shall automatically renew for a three (3) year Additional Employment Term beginning on the next Anniversary Date, unless the Executive shall provide written notice of his rejection of such renewal, in which case the Initial Employment Term (or any subsequent Additional Employment Term) shall terminate according to its terms.

The procedure for renewal of the Initial Employment term specified in this Section 3 shall apply to each Additional Employment Term, except that the two-hundred seventy (270) day notice period shall commence with the first day of such Additional Employment Term, and, pursuant thereto, Executive's employment may be renewed for additional three (3) year terms (each also an "Additional Employment Term").

A decision by the Company not to continue Executive's employment shall not be deemed to be a termination by the Company pursuant to Section 7 of this Severance Agreement, nor shall a decision by Executive not to agree to such continuation be deemed to be a termination by Executive pursuant to Section 5 of this Severance Agreement. In the event the Company decides not to continue Executive's employment, or Executive decides not to agree to such continuation, each pursuant to this Section 2, the Company shall be obligated to provide the payments and benefits sets forth in Sections 6(a)(iii-iv) of this Severance Agreement.

3. **Termination upon Death or Disability.**

(a)     Executive's employment by the Company shall terminate upon his death, or upon the Company's written notice if, by virtue of "Disability," Executive has been substantially unable to perform his material duties hereunder for a period greater than six (6) months. "Disability" shall mean permanent and total disability as defined in Section 22(e)(3) of the Internal Revenue Code (the "Code").

(b)     The Termination Date in the event of death shall be the date of death, and in the event of Disability shall be the date of the Company's written notice (provided that no such notice in the event of disability may be given until Executive has been substantially unable to perform his material duties hereunder for at least six (6) months, and that all obligations of the Company specified in the Agreement shall continue in full force and effect during such six (6) month period).

4. **Effect of Termination Upon Death or Disability.**

(a)     In the event of a termination of employment as a result of Executive's Disability, the Company shall:

> (i)     continue to pay Executive's Base Salary as of the Termination Date through the end of the Initial Employment Term or any applicable Additional Employment Term;
>
> (ii)    pay Annual Bonuses in accordance with the terms of any employment agreement between Executive and the Company through the end of the

        Initial Employment Term or any applicable Additional Employment Term, the amount of such Annual Bonuses being equal to the greater of (A) the last Annual Bonus paid before the Termination Date and (B) the average of the two greatest of the last five Annual Bonuses paid before the Termination Date (the "Average Annual Bonus") (for purposes of this Section 4(a) only, the Bonus paid to Executive in 1998 (the "1998 Bonus") shall be deemed to be an Annual Bonus). In the event that there have been fewer than five but at least three Annual Bonuses paid before such Termination Date, the Average Annual Bonus shall be calculated based on the two greatest of such Annual Bonuses; in the event that there have been two or fewer Annual Bonuses paid before such Termination Date, the Average Annual bonus shall be the average of all such Annual Bonuses;

    (iii)    be obligated to perform all obligations required under any employment agreement between Executive and the Company; and

    (iv)    pay all accrued but unused vacation pay.

(b)    In the event of a termination as a result of Executive's death, the Company shall:

    (i)    continue to pay Executive's Annual Salary as of the Termination Date for the period of one (1) year after the Termination Date;

    (ii)    pay an Annual Bonus for such one (1) year period in an amount equal to the greater of (A) the last Annual Bonus paid before the Termination Date and (B) the Average Annual Bonus;

    (iii)    be obligated to perform all obligations required under any employment agreement between Executive and the Company; and

    (iv)    pay all accrued but unused vacation pay.

5.    **Termination by the Executive.**

(a)    Executive may terminate his employment at any time upon thirty (30) days written notice for a "Good Reason" (as defined below), provided that (i) such notice is given within ninety (90) days of the event or actions constituting Good Reason and sets forth the facts and circumstances providing the basis for such termination and (ii) the Company shall not have taken actions within thirty (30) days of such notice such that the circumstances constituting a Good Reason have ceased. The Termination Date in the event of a termination under this Paragraph 5(a) shall be the date thirty (30) days after the date such notice is given.

(b)    Executive may terminate his employment for any reason other than a Good Reason upon thirty (30) days written notice to the Company. Upon such notice, the Company may elect to relieve Executive of his duties, responsibilities and authority hereunder during such thirty (30) day period, but all the Company's obligations pursuant to this Severance Agreement shall continue in full force and effect as if the Company had not made such an election.

(c) As used herein, a "Good Reason" shall mean any of the following:

(i) a change in the location of the principal offices of Raytheon to a location outside the metropolitan Boston area;

(ii) a material adverse change or diminution in Executive's duties, authority, responsibilities or reporting relationship as Senior Vice President—Human Resources for the Company (including a change which results in Executive no longer directly reporting to the President and Chief Executive Officer of the Company) which causes his position with the Company to become of less responsibility or authority than prior to such change or diminution, provided that such change is not in connection with a termination of Executive's employment hereunder by the Company;

(iii) the appointment of an individual other than Executive to serve as Senior Vice President—Human Resources (or position of similar responsibility and authority) of the Company;

(iv) a reduction in Executive's Base Salary, a failure to pay an Annual Bonus, or a material failure to pay any compensation or provide any benefit specified in this Severance Agreement;

(v) a material breach by the Company of a material provision of this Severance Agreement which has not been cured within thirty (30) days after written notice thereof by Executive;

(vi) failure to obtain the assumption, either explicitly or by operation of law, of this Severance Agreement by any successor to the Company; or

(vi) A "Change of Control" as defined in Section 5(d) of this Severance Agreement.

(d) <u>Change of Control</u>. A "Change of Control" means that any of the following events has occurred:

(i) any person as defined in Section 3(a)(9) of the Securities Exchange Act of 1934 Act, as amended (the "1934 Act") becomes the beneficial owner directly or indirectly of more than fifty (50%) of the outstanding Common Stock of the Company, determined in accordance with Rule 13d-3 under the 1934 Act (or any successor provision), or otherwise becomes entitled to vote more than fifty percent (50%) of the voting power entitled to be cast at elections for directors ("Voting Power") of the Company, or in any event such lower percentage as may at any time be provided for in any similar provision for any director or officer of the Company in any agreement with the Company or in any plan of the Company;

(ii) the stockholders or the Board shall have approved any consolidation or merger of the Company in which (A) the Company is not the continuing or

surviving corporation or (B) pursuant to which the holders of the Company's shares of Common Stock immediately prior to such merger or consolidation would not be the holders immediately after such merger or consolidation of at least two-thirds (2/3) of the Voting Power of the Company or such higher percentage as may at any time be provided for in any similar provision for any director or officer of the Company in any agreement with the Company or in any plan of the Company;

(iii) the stockholders or the Board of Directors shall have approved any sale, lease, exchange or other transfer (in one transaction or a series of transactions) of assets of the Company constituting at least fifty percent (50%) of the Company's assets on a consolidated basis based on either the book value thereof determined in accordance with generally accepted accounting principles consistently applied as of the most recently concluded fiscal year or fair market value thereof based on a valuation by a recognized investment banking firm or other recognized third party appraiser; or

(iv) upon the election of one or more directors of the Company, a majority of the directors holding office, including the newly elected directors, were not nominated as candidates by a majority of the directors in office immediately before such election.

As used in this definition of Change of Control, "Common Stock" means the capital stock of the Company as it shall be constituted from time to time entitling the holders thereof to share generally in the distribution of all assets available for distribution to the Company's stockholders after the distribution to any holders of capital stock with preferential rights.

6. **Effect of Termination by Executive.**

(a) In the event of a termination by Executive for a Good Reason, the Company shall:

(i) continue to pay Executive's Annual Salary as of the Termination Date through the end of the Initial Employment Term or any Additional Employment Term;

(ii) pay Annual Bonuses in accordance with the terms of any agreement between Executive and the Company through the end of the Initial Employment Term or any Additional Employment Term; the amount of such Annual Bonuses shall be equal to the greater of (A) the last Annual Bonus paid before the Termination Date and (B) the Average Annual Bonus;

(iii) be obligated to perform all obligations required under any employment agreement between Executive and the Company; and

(iv) pay all accrued but unused vacation pay;

- 5 -

(b) In the event of a termination by Executive for any reason other than a Good Reason, the Company shall:

    (i) be obligated to perform all obligations required under any employment agreement between Executive and the Company; and

    (ii) pay all accrued but unused vacation pay.

7. **Termination by the Company.**

(a) Executive's employment may be terminated by the Company:

    (i) at any time for "Cause" (as defined below) immediately upon written notice, the date of such notice being the Termination Date. Such termination for Cause must be approved or ratified by, and no notice of termination may be given before, the affirmative vote of a majority of the members of the Board after giving Executive reasonable advance notice and an opportunity for Executive and his legal counsel to be heard before the Board.

    (ii) at any time without Cause upon thirty (30) days written notice, the date of such notice being the Termination Date. Upon such notice, the Executive may elect to be relieved of his duties, responsibilities and authority hereunder during such thirty (30) day period, but all the Company's obligations pursuant to this Severance Agreement shall continue in full force and effect as if Executive had not made such an election.

(b) For purposes of this Severance Agreement, "Cause" shall be defined as:

    (i) the Executive's conviction, including a plea of <u>nolo contendere</u>, of a felony, which conviction has materially affected Executive's ability to carry out his material duties pursuant to this Severance Agreement;

    (ii) the Executive's willful and continued failure to substantially perform his material duties under this Severance Agreement or any other written employment agreement with the Company (or willful gross neglect resulting in such continued failure) without reasonable cause, which failure has not been cured within thirty (30) days after written notice of such alleged failure by the Company;

    (iii) a material breach of the confidentiality provisions of this Severance Agreement which has a material adverse effect upon the Company's business or its employees.

8. **Effect of Termination by Company.**

(a) In the event of a termination by the Company without Cause, the Company shall:

- 6 -

    (i)    continue to pay Executive's Annual Salary as of the Termination Date through the end of the Initial Employment Term or any Additional Employment Term;

    (ii)    pay Annual Bonuses in accordance with the terms of any agreement between Executive and the Company through the end of the Initial Employment Term or any Additional Employment Term; the amount of such Annual Bonuses shall be equal to the greater of (A) the last Annual Bonus paid before the Termination Date and (B) the Average Annual Bonus;

    (iii)    be obligated to perform all obligations required under any employment agreement between Executive and the Company; and

    (iv)    pay all accrued but unused vacation pay.

(b)    In the event of a termination by the Company for Cause, the Company shall:

    (i)    be obligated to perform all obligations required under any employment agreement between Executive and the Company; and.

    (ii)    pay all accrued but unused vacation pay.

## 9. No Requirement to Mitigate; No Offset.

Notwithstanding any other provision of this Severance Agreement or any employment agreement between Executive and the Company, statutory or common law, Executive shall have no obligation to mitigate his damages for any breach of this Severance Agreement (or any employment agreement between Executive and the Company) by Company, whether by seeking employment or otherwise, nor shall any post-Termination Date payment or benefit pursuant to this Severance Agreement (or any employment agreement between the Executive and the Company) be offset or reduced by any payments Executive receives from any other source. Except as specifically provided herein, the Company shall have no right to offset any amounts owed by Executive to Company against amounts owed by Company to Executive.

## 10. Confidentiality.

The Executive shall not, during the term of his employment and thereafter, unless authorized by the Company, use or disclose to any person or entity, any confidential information with respect to the business or affairs of the Company. For purposes of this Section 10, information shall not be deemed confidential if such information (i) is or becomes known to the general public under circumstances involving no breach by Executive of this Section of the Agreement or (ii) is generally disclosed to third parties by the Company without restriction without restriction on such third parties.

11. **Indemnification.**

The Company will indemnify Executive for any actions within the scope of his duties to the maximum extent permitted by the Company's bylaws as they may be amended from time to time.

12. **Excise Tax.** In the event Executive is subject to any excise tax ("Excise Tax") on his compensation by the Company whether as a result of payment of any sum or provision of any benefit hereunder or under any agreement between Executive and the Company, the terms of options or otherwise (including but not limited to excise taxes imposed under Section 4999 of the Code), the Company agrees that it will then "gross-up" Executive's compensation by making an additional payment to him in an amount which, after reduction for any income or excise taxes payable as a result or receiving such additional payment, is equal to the Excise Tax.

13. **Dispute Resolution; Choice of Law.**

(a) Any dispute relating to or arising under this Severance Agreement or any employment agreement between Executive and the Company (with the exception of claims by Executive pursuant to the federal Age Discrimination in Employment Act) shall be resolved by binding arbitration pursuant to the procedures specified by the National Rules for the Resolution of Employment Disputes (the "Employment Arbitration Rules") established by the American Arbitration Association, effective June 1, 1997. Notwithstanding any provision of the Employment Arbitration Rules, neither party shall be entitled to discovery in the course of such arbitration, the arbitration shall take place in Boston, Massachusetts (or any other location mutually acceptable to Company and Executive), and shall be heard by a single arbitrator possessing at least ten (10) years of experience arbitrating employment disputes between employers and senior executives. The sole function of the arbitrator shall be to enforce this Severance Agreement (or any employment agreement between Executive and the Company) pursuant to its terms, and the parties explicitly agree that the arbitrator shall have no power to vary the terms of this Severance Agreement or any employment agreement between the Executive and the Company. The parties further agree that any award rendered by such arbitrator may be entered in any court with proper jurisdiction. All obligations pursuant to this Severance Agreement or any employment agreement between Executive and the Company, including all post-Termination Date payments to, and benefits provided for, Executive, shall continue in full force and effect pending a decision of the arbitrator. Each party shall pay its own arbitration costs, provided that should the Executive prevail in any arbitration action, the Company shall be liable to Executive for all attorneys fees and costs, and shall promptly pay the same.

(b) This Severance Agreement and any employment agreement between Executive and the Company and the rights and obligations of the parties hereunder or thereunder shall be construed in accordance with and governed by the law of the Commonwealth of Massachusetts, without giving effect to the conflict of law principles thereof.

14. **General.**

(a) *Notices.* All notices and other communications hereunder or under any employment agreement between Executive and the Company shall be in writing, shall be

addressed to the receiving party's address set forth below or to such other address as a party may designate by notice hereunder, and shall be either (i) delivered by hand, (ii) made by telecopy, (iii) sent by overnight courier, or (iv) sent by certified mail, return receipt requested, postage prepaid.

| | |
|---|---|
| If to the Company: | General Counsel<br>Raytheon Company<br>141 Spring Street<br>Lexington, MA 02173-7899 |
| If to Executive: | Dennis Donovan<br>24 Gravesleigh Terrace<br>Pittsfield, MA 01201 |
| With copies to: | Robert M. Gault, Esquire<br>Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.<br>One Financial Center<br>Boston, MA 02141<br>617-542-6000<br><br>Daniel R. Solin, Esquire<br>P.O. Box 630<br>New Lebanon, NY 12125<br>518-794-8533 |

All notices and other communications hereunder or under any employment agreement between Executive and the Company shall be deemed to have been given either (i) if by hand, at the time of the delivery thereof to the receiving party at the address of such party set forth above, (ii) if made by telecopy, at the time that receipt thereof has been acknowledged by electronic confirmation or otherwise, (iii) if sent by overnight courier, on the next business day following the day such notice is delivered to the courier service, or (iv) if sent by certified mail, on the fifth business day following the day such mailing is made.

(b)  *Modifications and Amendments.*  The terms and provisions of this Severance Agreement or any employment agreement between Executive and the Company may be modified or amended only by written agreement executed by the parties hereto.

(c)  *Waivers and Consents.*  The terms and provisions of this Severance Agreement or any employment agreement between Executive and the Company may be waived, or consent for the departure therefrom granted, only by written document executed by the party entitled to the benefits of such terms or provisions. No such waiver or consent shall be deemed to be or shall constitute a waiver or consent with respect to any other terms or provisions of this Severance Agreement or any employment agreement between Executive and the Company, whether or not similar. Each such waiver or consent shall be effective only in the specific instance and for the purpose for which it was given, and shall not constitute a continuing waiver or consent.

(i) *Rules of Interpretation.* In interpreting this Severance Agreement or any employment agreement between Executive and the Company, the rule of *contra proferentem* shall not apply.

(j) *Counterparts.* This Severance Agreement may be executed in one or more counterparts, and by different parties hereto on separate counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. A faxed signature shall be deemed to be an original signature.

(k) The undersigned hereby represents that he is duly authorized to execute this Severance Agreement on behalf of the Company and that all necessary approvals of any board, committee, body, or other person have been obtained.

Very truly yours,

RAYTHEON COMPANY

By: Daniel P. Burnham, Chief Operating Officer

Agreed to and accepted:

Dennis M. Donovan

Date: 10/2/98

LITDOCS: 106995T.3 (#g3r0)" 6vc)

- 11 -