**Raytheon**

| | |
|---|---|
| **Daniel P. Burnham**<br>Chairman and<br>Chief Executive Officer<br>781.860.2207<br>781.860.2228 fax<br>daniel_p_burnham@raytheon.com | **Raytheon Company**<br>141 Spring Street<br>Lexington, Massachusetts<br>02421 USA |

**To:** Dennis M. Donovan

**From:** Daniel P. Burnham

**Date:** January 25, 2000

**RE:** Second Amendment to Employment Agreement

---

We hereby agree that your Employment Agreement, dated October 1, 1998, as subsequently amended on November 12, 1998 by letter signed by our respective counsel (the "Employment Agreement"), be and hereby is amended effective January 25, 2000, as provided for herein. Except as specifically modified herein, the terms of your Employment Agreement, and all other agreements, exhibits and other instruments related thereto or to your employment with Raytheon (including any of its successors or assigns, the "Company") shall remain in full force and effect. This second amendment to your Employment Agreement shall be referred to herein as the "Amendment." This Amendment received the required reviews and approvals of the Company's Board of Directors and its Management Development and Compensation Committee.

Effective January 25, 2000, your Employment Agreement is amended as follows:

1. **_Commencement Bonus_**. The second sentence of Section 4 of the Employment Agreement is deleted to reflect our new agreement that repayment of the Commencement Bonus under any circumstances shall not be required.

2. **_Executive Retirement Benefit_**. Section 6(d) and Attachment 1 of the Employment Agreement are deleted in their entirety and replaced with the following:

"(d) *Executive Retirement Benefit*. You are entitled unconditionally to a retirement benefit (the "Executive Retirement Benefit"), with payments to begin upon the later to occur of the termination of your employment from the Company <u>for any reason</u> or the attainment by you of age 53. Your Executive Retirement Benefit shall be calculated so as to provide you with a retirement benefit at age 60 equal to 65% of the average of your highest three (3) years' annual base salary and bonus as paid by the Company (or any successor to the Company, including but not limited to any purchaser of the Company or its assets, or assignee of the Company or any entity into or with which the Company may merge (collectively the "Company")); provided, that in the event you are employed for less than three (3) full calendar years by the Company, your Executive Retirement Benefit will be based on your highest annual base salary and bonus as paid by the Company. The initial annual amount payable as an Executive Retirement Benefit shall be increased each year after payment begins by an amount equal to the greater of (i) the annual percentage increase in the Company's executive base salary plan for then active executive employees of the Company or (ii) the annual percentage cost-of-living increase as indicated by the National Consumer Price Index ("National CPI"), in either case, such increase to be applied as of January 1 of each year. The target Executive Retirement Benefit percentage of 65% (applied to the average of your highest three (3)

years' base and bonus with the Company (or highest base and bonus, if applicable)) shall be reduced by 1% for each year under age 60 in which the initial Executive Retirement Benefit is commenced. Attachment 1A (which supersedes and replaces Attachment 1 of the Employment Agreement) attached and incorporated herein illustrates the Executive Retirement Benefit to be paid to you.

The Executive Retirement Benefit amount payable to you from the Company shall not be reduced by any amounts paid or payable to you from any other source, including, without limitation, any prior employer's retirement program. The Executive Retirement Benefit will be always fully vested and nonforfeitable regardless of the time of, or the reason for, your termination of employment with the Company, and regardless of whether such termination is voluntary or involuntary, or as a result of a nonrenewal (your or the Company's decision not to renew your Employment Agreement). The Executive Retirement Benefit shall be payable to you notwithstanding any provision of any Company retirement program that may provide for a different benefit to similarly situated executives of the Company.

The Executive Retirement Benefit shall be payable to you for your life. At your death, the Executive Retirement Benefit shall be payable to your spouse, who shall be paid 100% of the Executive Retirement Benefit you received unreduced and unadjusted for her age or any other factor, but increased yearly by an amount equal to the greater of (x) the annual percentage increase in the Company's executive base salary plan for then active executive employees of the Company or (y) the annual percentage cost-of living increase as indicated by the National CPI, in either case, such increase to be applied as of January 1 of each year.

It is specifically understood and agreed that the Executive Retirement Benefit received by either you or your spouse will not be actuarially decreased for either you or your spouse because of the survivor payment payable to your spouse described herein or for any other reason."

The Executive Retirement Benefit as described herein shall replace in its entirety the provisions of Section 6(d) of the Employment Agreement. Attachment 1A supersedes and replaces Attachment 1 of the Employment Agreement. As of the January 25, 2000, the prior provisions of such Section 6(d) and Attachment 1 shall have no further force and effect.

3. *Stock Options*.

(a) Section 7(a) of the Employment Agreement is amended by deleting the phrase "35,000 shares" where it appears in such subsection and replacing it with the phrase "55,000 shares."

(b) Section 7 is further amended by adding a new Section 7(c) at the end thereof as follows:

"(c) *Retention Stock Option*. Pursuant to the Option Plan, as of January 25, 2000, you were awarded (i) a non-qualified option to purchase 200,000 shares of Company common stock, at a price per share equal to the closing price of the

2

Company's common stock on January 25, 2000, as reported by the New York Stock Exchange ("NYSE") and (ii) a non-qualified option to purchase 100,000 shares of Company common stock, at a price per share equal to the closing price of the Company's common stock on February 25, 2000, as reported by the NYSE. Notwithstanding the provisions of the Option Plan, the Retention Stock Option shall have the terms and conditions set forth on Exhibit A1, the terms and conditions of which are incorporated into this Agreement and which will supersede any contrary provisions in the Option Plan."

(c) All other provisions of Section 7 of the Employment Agreement shall remain in effect. Exhibit A of the Employment Agreement is hereby replaced and superseded by Exhibit A1 (attached and incorporated herein) and all references to Exhibit A in the Employment Agreement shall be deemed to be references to Exhibit A1. The Raytheon Company Nonqualified Stock Option Agreement entered into by and between you and the Company, dated May 3, 1999, shall be amended to reflect, as necessary, the changes described herein or on Exhibit A1. It is specifically understood that a new stock option agreement shall be entered into as soon as reasonably practicable following execution of this Amendment to reflect the option award described in subparagraph (b) above.

4. *Restricted Units and Shares.* Section 8 of the Employment Agreement is amended to designate the first paragraph as subsection (a) and to add new subsections (b) and (c) as follows:

"(b) As of October 26, 1999, you were granted Twenty Thousand (20,000) restricted shares of Company common stock as a Restricted Stock Award under the Stock Plan. Notwithstanding the provisions of the Stock Plan, the Restricted Stock Award shall have the terms and conditions set forth on Exhibit B1, the terms and conditions of which are incorporated into this Agreement and which will supersede any contrary provisions in the Stock Plan.

(c) As of January 25, 2000, you were granted One Hundred and Fifty Thousand (150,000) restricted shares of Company common stock as a Restricted Stock Award under the Stock Plan. Notwithstanding the provisions of the Stock Plan, the Restricted Stock Award shall have the terms and conditions set forth on Exhibit B1, the terms and conditions of which are incorporated into this Agreement and which will supersede any contrary provisions in the Stock Plan."

All other provisions of Section 8 of the Employment Agreement shall remain in effect. Exhibit B of the Employment Agreement is hereby replaced and superseded by Exhibit B1 (attached and incorporated herein) and all references to Exhibit B in the Employment Agreement shall be deemed to be references to Exhibit B1. The Restricted Unit Award Agreement entered into by and between you and the Company, dated May 3, 1999, shall be amended to reflect, as necessary, the changes described herein or on Exhibit B1. It is specifically understood that a new agreement shall be entered into as soon as reasonably practicable following execution of this Amendment to reflect the Restricted Stock Awards described herein.

5. *Life Insurance*.

In addition to the split dollar life insurance benefit provided pursuant to the Employment Agreement, Section 6(e) of the Employment Agreement is amended by adding a supplemental split dollar life insurance benefit ("SSDL"), as follows:

(a) In addition to the split dollar life insurance benefit provided in Section 6(e) of the Employment Agreement, effective as of January 25, 2000, the Company shall procure and maintain a separate split-dollar life insurance policy (the "Policy") in the amount of Ten Million Dollars ($10,000,000.00) on your life. The Policy shall be owned by a trust to be established for the benefit of beneficiaries designated by you (the "Trust").

(b) This SSDL will be provided pursuant to a supplemental split dollar life insurance agreement entered into by the Trust and the Company as soon as reasonably practicable following the execution of this Amendment. The Company shall take such steps as are necessary (including, without limitation, obtaining a temporary insurance policy) to provide for payment of the SSDL benefit as described herein in the event that you die before either the SSDL agreement or SSDL Policy are in place.

(c) Except as modified herein, the SSDL agreement shall be substantively identical to the Split Dollar Life Insurance Agreement entered into by and between you and the Company and executed on July 6, 1999. In no way limiting the foregoing, the SSDL agreement shall include the following key provisions:

(i) The Policy shall be purchased on your life with a face value of Ten Million Dollars ($10,000,000) with an increasing death benefit option. The Policy shall be purchased from a reputable and financially sound insurance company as selected by you with the Company's consent, which consent shall not be unreasonably withheld.

(ii) All premiums due on the Policy shall be paid solely by the Company. The Company's premium payments shall be made during the five year period beginning January 1, 2000 and ending on December 31, 2004. Until your death, and irrespective of any termination of the Employment Agreement or termination by you for any reason, the Company agrees to pay all premiums on such policy and shall maintain such policy, without reduction of the face amount of the coverage.

(iii) The benefit payable shall be payable to the Trust irrespective of whether you are employed by the Company at the time of your death or at the time the Policy is surrendered and irrespective of the reasons for your termination (whether voluntary or involuntary), and irrespective of whether you or the Company decides not to renew the Employment Agreement.

(iv) The Company will pay (or shall caused to be paid) to you (or your wife, or, if applicable, your or her estate or the Trust or other assignee) each year an amount equal to (A) the federal and (if applicable) state income taxes owed by

4



such taxpayer on the imputed income under applicable tax rules generated by the Company's payment of premiums with respect to the Policy, (B) the federal and (if applicable) state income taxes owed for any gift taxes related to the benefit, and (C) any federal and (if applicable) state income taxes owed as a result of the payments contemplated herein. The gross up shall be calculated to ensure that no out-of-pocket expense is incurred by you or your beneficiaries incident to the purchase of the life insurance by the Company or the payment of the benefit contemplated thereby.

(v) A legally enforceable methodology (designed to reduce your tax exposure) shall be mutually agreed upon to provide for repayment to the Company upon your death or surrender of the Policy, the premium amounts paid by it, net of (i) tax benefits, if any, to the Company in respect of payment of such premiums; (ii) any premium amounts paid or reimbursed by the trust or paid or reimbursed on the trust's behalf; (iii) dividends received by the Company in respect of such premiums, but only to the extent such dividends are not used to purchase additional insurance on your life; and (iv) any unpaid borrowings by the Company on the policy. The balance of the benefit payable under the Policy shall be paid to the Trust. In no event shall the amount payable to the Company hereunder exceed the Policy proceeds payable at death or surrender.

(vi) After the Policy has been in effect for at least fifteen (15) years, the Company may, in its discretion, withdraw from the policy such amounts as it has paid in premiums; provided, that such withdrawal shall only be permitted if the Policy has a cash value projected to be sufficient to provide the benefit until the Policy maturity date specified in the Policy (determined without regard to any Policy rider which extends the maturity date beyond the originally scheduled Policy maturity date), with no further premium payments, following such withdrawal by the Company. Simultaneous with such withdrawal the Company shall execute or cause to be executed an agreement discharging the Trust or its beneficiaries from the premium repayment requirements.

The SSDL is in addition to the benefits provided for in section 6(e) of the Employment Agreement. Accordingly, all provisions of Section 6(e) of the Employment Agreement (and all agreements related thereto) shall remain in full force and effect.

6. *Authority*. The undersigned hereby represents that he is duly authorized to execute this Amendment on behalf of the Company and that all necessary approvals of any board, committee, body, or other person have been obtained. It is understood and agreed that this Amendment to your Employment Agreement shall constitute a binding agreement upon execution by both parties. If the terms of this Amendment are acceptable to you, please sign where indicated below. This Amendment is executed as an instrument under seal as of the date indicated below.

Very truly yours,

RAYTHEON COMPANY

By: _____
Daniel P. Burnham, Chairman and
Chief Executive Officer

Agreed to and Accepted by:

_____
Dennis M. Donovan

Date: 3/13/2000

# EXHIBIT A1

## STOCK OPTIONS

1. **Replacement Options.**

    (a) Pursuant to its 1995 Stock Option Plan (the "Plan"), as soon as possible and in any event no later than October 31, 1998 (such date of grant to be its "grant date"), the Company will award you a non-qualified stock option to purchase 200,000 shares of the Common Stock, $.01 par value per share, of the Company at a price per share equal to the closing price of the Company's Common Stock as of October 1, 1998, as reported by the New York Stock Exchange ("NYSE").

    (b) This option shall become exercisable as follows:

    (i) The option for 100,000 shares shall become exercisable October 1, 1999; and

    (ii) The option for 100,000 shares shall become exercisable October 1, 2000.

2. **Regular Stock Options.** The Company, pursuant to the Plan, has agreed to award you a stock option to purchase 55,000 shares of the Common Stock, $.01 par value per share, of the Company at a price per share equal to the closing price of the Company's Common Stock. To the extent practicable, including to the extent you exercise your option within the applicable time periods following your termination of employment, such options shall be treated as incentive stock options as defined under the Code.

3. **Retention Options.**

    (a) Pursuant to the Option Plan, as of January 25, 2000 (its "grant date"), you were awarded (i) a non-qualified option to purchase 200,000 shares of Company common stock, at a price per share equal to the closing price of the Company's common stock on January 25, 2000, as reported by the New York Stock Exchange ("NYSE") and (ii) a non-qualified option to purchase 100,000 shares of Company common stock, at a price per share equal to the closing price of the Company's common stock on February 25, 2000, as reported by the NYSE. Notwithstanding the provisions of the Option Plan, the Retention Stock Options shall have the terms and conditions set forth on Exhibit A1, the terms and conditions of which are incorporated into this Agreement and which will supersede any contrary provisions in the Option Plan.

    (b) Notwithstanding the provisions of the Plan, this option shall become exercisable as follows:

    (i) The option for 200,000 shares shall become exercisable on January 25, 2001;

    (ii) The option for 33,334 shares shall become exercisable on February 25, 2001;

    (iii) The option for 33,333 shares shall become exercisable on February 25, 2002; and

    (iv) The option for 33,333 shares shall become exercisable on February 25, 2003.

# EXHIBIT A1

## STOCK OPTIONS

4. **General Terms**. The following terms and conditions are applicable with respect to the options granted pursuant to Sections 1, 2 and 3 above:

(a) The options shall be transferable to the extent permissible under the Plan.

(b) The options shall have a term of ten years from their respective grant dates (in all cases the "Option Termination Date"). In the event of termination of your employment with the Company (or a parent or subsidiary of the Company) due to "Cause" (as defined in Section 4 of the Employment Agreement dated October 1, 1998 (as amended on November 12, 1998 and as subsequently amended on January 25, 2000)) to which this Exhibit A1 is attached and incorporated (the "Agreement") or your voluntary termination of your employment (other than as due to the events set forth below), all vested unexercised options shall terminate three (3) months following the last date of your employment by the Company and all unvested options shall terminate immediately. In all other events, including (i) your death; (ii) your disability (as defined in Section 22(e)(3) of the Internal Revenue Code (the "Code")); (iii) a Change in Control of the Company (as defined in the Plan), (iv) termination of your employment by the Company without Cause or as a result of the nonrenewal of your Agreement, or (v) termination of your employment with the Company for a "Good Reason" as defined in Section 4 of the Agreement), all options shall terminate on the Option Termination Date.

(c) Notwithstanding the foregoing, the options shall become immediately exercisable in full in the event of (i) your death, (ii) your Disability, (iii) a breach by the Company of any material provision in any agreement between you and the Company, (iv) the termination of your employment by the Company without "Cause" pursuant to Section 4 of the Agreement, (v) termination of your employment with the Company for a "Good Reason," or (vi) the nonrenewal of the Agreement.

5. **Additional Option Grants**. The Company shall grant to you additional stock option grants in accordance with the Company's stock option policy as in effect from time to time.

# EXHIBIT B1

## RESTRICTED AWARD

Pursuant to that certain employment agreement dated as of October 1, 1998 (as amended on November 12, 1998 and as subsequently amended on January 25, 2000) to which this Exhibit B1 is attached and incorporated (the "Agreement"), the following Restricted Awards are granted to you:

1. **Restricted Unit Award.** As soon as possible and in any event no later than October 31, 1998, the Company will award you a Restricted Unit Award consisting of One Hundred Thousand (100,000) units, with each unit representing one share of Common Stock of the Corporation under the Corporation's 1991 Stock Plan ("the Plan"), as follows:

    If you are continuously employed by the Company or one of its subsidiaries from the date of grant of this Restricted Unit Award through the dates listed below (each a "Vesting Date"), then on each such Vesting Date you shall be vested with the right to receive the number of units set forth opposite such Vesting Date and such right shall not thereafter be subject to forfeiture for any reason.

    | Date | Number of Units Vesting |
    |---|---|
    | May 1, 2000 | 40,000 |
    | January 1, 2002 | 60,000 |

2. **Restricted Stock Award.** You have also been granted the following Restricted Stock Awards:

    (a) As of October 26, 1999, you were granted Twenty Thousand (20,000) restricted shares of Company common stock as a Restricted Stock Award under the Stock Plan. Notwithstanding the provisions of the Stock Plan, the Restricted Stock Award shall have the terms and conditions as set forth on this Exhibit B1, which will supersede any contrary provisions in the Stock Plan. The restrictions lapse and the Restricted Stock Award described herein becomes fully vested on October 26, 2001.

    (b) As of January 25, 2000, you were granted One Hundred and Fifty Thousand (150,000) restricted shares of Company common stock as a Restricted Stock Award under the Stock Plan. Notwithstanding the provisions of the Stock Plan, the Restricted Stock Award shall have the terms and conditions set forth on this Exhibit B1, which will supersede any contrary provisions in the Stock Plan. The 150,000 shares of the Restricted Stock Award shall vest as follows:

9



**EXHIBIT B1**

**RESTRICTED AWARD**

| Date | Number of Shares Vesting |
|---|---|
| January 25, 2002 | 50,000 |
| January 25, 2004 | 50,000 |
| January 25, 2006 | 50,000 |

3. **General Terms.**

    (a)    No payment (other than in connection with withholding tax obligations) shall be required from you in connection with the Restricted Awards described in Sections 1 and 2 above.

    (b)    Notwithstanding the provisions of Sections 1 or 2 above, your right to receive the number of Restricted Units or Restricted Stock described above shall be fully vested and not thereafter subject to forfeiture for any reason upon the occurrence of one or more of the following events: (i) your death; (ii) your disability (as defined in Section 22(e)(3) of the Internal Revenue Code (the "Code"); (iii) a Change in Control of the Corporation (as defined in the Plan); or (v) termination of your employment with the Company for any reason (including, but not limited to, termination of employment by you for a "Good Reason" as defined in Section 4 of the Agreement or the nonrenewal of the Agreement) other than (A) "Cause" (as defined in Section 4 of the Agreement) or (B) voluntary termination of your employment (other than due to the events as set forth above).

    (c)    The settlement with respect to all Restricted Units covered by this Restricted Award is to be made under the terms of the Plan as of the Settlement Date. The "Settlement Date" shall be determined by you on or prior to the date which is four (4) months prior to the applicable Vesting Date (as determined pursuant to Section 1 or Section 3(b) hereof) and shall be either (i) the Vesting Date or (ii) that date chosen at the time of termination of employment which is within one year following your last day worked designated as the Settlement Date by you in writing to the Company, provided that such date may not be earlier than the date such notice is delivered to the Company. If you fail to designate a Settlement Date, the Settlement Date shall be the first anniversary of your last day of work. In the event that the Settlement Date falls on a day that is not a New York Stock Exchange ("NYSE") trading day, the Settlement Date shall be the next preceding NYSE trading day.

TRADOCS:1286612.7(rkr807!.DOC)



## ATTACHMENT 1A

## RETIREMENT BENEFIT ILLUSTRATION

| YEAR | AGE AT TERMINATION (JANUARY) | DELIVERY PERCENTAGE OF COMPENS. | ANNUAL BASE EXAMPLE $ | ANNUAL BONUS EXAMPLE $ | ANNUAL TOTAL BASE AND BONUS EXAMPLE $ | INITIAL ANNUAL RETIREMENT BENEFIT $ |
|---|---|---|---|---|---|---|
| 1999 | NA | 55 | 400,000 | 375,000 | 775,000 | NA |
| 2000 | 51 | 56 | 425,000 | 325,000 | 750,000 | 449,500 * |
| 2001 | 52 | 57 | 445,000 | 445,000 | 890,000 | 449,500 * |
| 2002 | 53 | 58 | 464,000 | 464,000 | 928,000 | 516,200 |
| 2003 | 54 | 59 | 485,000 | 485,000 | 970,000 | 509,957 |
| 2004 | 55 | 60 | 507,000 | 507,000 | 1,014,000 | 557,600 |
| 2005 | 56 | 61 | 530,000 | 530,000 | 1,060,000 | 592,107 |
| 2006 | 57 | 62 | 553,000 | 553,000 | 1,106,000 | 629,093 |
| 2007 | 58 | 63 | 578,000 | 578,000 | 1,156,000 | 667,800 |
| 2008 | 59 | 64 | 604,000 | 604,000 | 1,208,000 | 708,693 |
| 2009 | 60 | 65 | 632,000 | 632,000 | 1,264,000 | 751,833 |

* Initial executive retirement benefit payable in January 2002 at age 53.

11

## ATTACHMENT 1A
## WORKSHEET

| JANUARY | INITIAL ANNUAL RET. BENEFIT | CALCULATION | | | |
|---|---|---|---|---|---|
| 2000 | 449,500 * | 775,000 | X .58 | | |
| 2001 | 449,500 * | 775,000 | X .58 | | |
| 2002 | 516,200 | 890,000 | X .58 | | |
| 2003 | 509,957 | 928,000 | | | |
| | | 890,000 | | | |
| | | 775,000 | | | |
| | | 2,593,000 | / 3 = | 864,333 | X .59 |
| 2004 | 557,600 | 970,000 | | | |
| | | 928,000 | | | |
| | | 890,000 | | | |
| | | 2,788,000 | / 3 = | 929,333 | X .60 |
| 2005 | 592,107 | 1,014,000 | | | |
| | | 970,000 | | | |
| | | 928,000 | | | |
| | | 2,912,000 | / 3 = | 970,667 | X .61 |
| 2006 | 629,093 | 1,060,000 | | | |
| | | 1,014,000 | | | |
| | | 970,000 | | | |
| | | 3,044,000 | / 3 = | 1,014,667 | X .62 |
| 2007 | 667,800 | 1,106,000 | | | |
| | | 1,060,000 | | | |
| | | 1,014,000 | | | |
| | | 3,180,000 | / 3 = | 1,060,000 | X .63 |
| 2008 | 708,693 | 1,156,000 | | | |
| | | 1,106,000 | | | |
| | | 1,060,000 | | | |
| | | 3,322,000 | / 3 = | 1,107,333 | X .64 |
| 2009 | 751,833 | 1,208,000 | | | |
| | | 1,156,000 | | | |
| | | 1,106,000 | | | |
| | | 3,470,000 | / 3 = | 1,156,667 | X .65 |

* Initial executive retirement benefit payable in January 2002 at age 53.

12